**In re BLUE DIAMOND COAL COMPANY, Debtor.**

**Bankruptcy No. 91–32611.**

United States Bankruptcy Court,
E.D. Tennessee.

Nov. 12, 1992.

Hodges, Doughty & Carson, Thomas H. Dickenson, Arnett, Draper & Hagood, Lewis R. Hagood, Knoxville, Tenn., for the debtor.

Hardy, Logan, Priddy & Cotton, Alton D. Priddy, Louisville, Ky., for the Southern Labor Union, Local No. 188.

## MEMORANDUM ON DEBTOR'S OBJECTION TO CLAIM FILED BY THE SOUTHERN LABOR UNION, LOCAL NO. 188

RICHARD S. STAIR, Jr., Bankruptcy Judge.

The court is called upon to determine whether damages allegedly arising from interim changes implemented in the terms of a collective bargaining agreement pursuant to Code § 1113(e) and from the debtor's subsequent rejection of that collective bargaining agreement pursuant to Code § 1113(c) are recoverable by the Southern Labor Union, Local No. 188 (Union). Specifically, the court has before it the debtor's Objection To Claim filed on January 8, 1992. By an Order entered on May 7, 1992, the court bifurcated the issue of the amount of damages until it determined whether the Union is entitled to recover damages, and, if so, the proper legal measure of those damages. Also before the court is the debtor's "Motion To Dismiss Amended Claim No. 167 Filed By Southern Labor Union Local 188 For Hourly Employees" which was filed on September 3, 1992. This motion repeats issues raised by the debtor in its Objection To Claim. Consequently, the two will be considered together.

The record consists of testimony and exhibits introduced at a hearing held on July 10, 1992. Further, the parties stipulate that the entire record produced during the earlier hearings on interim changes and rejection is also part of the record which the court may consider in its resolution of this contested proceeding.[1]

This is a core proceeding. 28 U.S.C.A. § 157(b)(2)(B) (West Supp.1992).

I

The debtor commenced its bankruptcy case by filing a voluntary petition under Chapter 11 on May 17, 1991. At the time of the petition, the debtor and Union were signatories to a collective bargaining agreement (Agreement) entered into on May 14, 1990. The Agreement, with an effective date of May 5, 1990, was to continue in effect for three years until May 5, 1993.

On the day the debtor filed its Chapter 11 petition, it also sought authority to implement certain interim changes to the Agreement pursuant to Code § 1113(e). This court granted the interim changes requested at the conclusion of a hearing on May 31, 1991. The relief consisted principally of decreases in wages and benefits.[2]

On June 6, 1991, the debtor filed a second motion requesting additional interim changes to the Agreement under § 1113(e). By this motion, the debtor sought to eliminate restrictions in the Agreement that tied the number of tons of coal the debtor could purchase from independent contract miners to the number of bargaining unit members on the debtor's active work force. The court granted this interim change for a 30 day period at the conclusion of a hearing on June 10, 1991.

In implementing the second interim change, the debtor laid off all but 12 bargaining unit employees and began acquiring substantially all of its coal from contract miners. The court, upon subsequent motions by the debtor, extended this interim change through August 31, 1991. On August 30, 1991, subsequent to a hearing held on August 5, 6 and 15, 1991, this court granted the debtor's "Application" to reject the Agreement pursuant to § 1113(c). *See In re Blue Diamond Coal Co.*, 131 B.R. 633 (Bankr.E.D.Tenn.1991), *aff'd* Civ. No. 3–91–0741, slip op. (E.D.Tenn., April 20, 1992), appeal docketed, No. 92–5747 (6th Cir., June 10, 1992). The court notes that in permitting the debtor to reject the Agreement it determined that the debtor could not otherwise survive and reorganize. 131 B.R. at 644 and 646–48.

On October 11, 1991, a proof of claim, designated as Claim No. 167, was filed by "Adrienne A. Berry, Atty [sic] for Employees—Claimants." This claim, listing 282 individual bargaining unit employees as claimants, seeks a total of $19,432,451.40 as "damages from rejection of the Collective Bargaining Agreement." Each employee identified in an exhibit attached to the claim by name and social security number asserts a claim in an "Amount Owed" column ranging between $67,000 and $70,-000. On April 16, 1992, Claim No. 167 was amended by the Union's filing of an amended claim, designated as Claim No. 244.[3] This claim was filed in the name of "SLU, LOCAL 188, FOR HOURLY EMPLOYEES" and seeks $17,389,811.09 to $18,524,-

---

1. This record consists of exhibits and testimony introduced at the hearing held on August 5, 6, and 15, 1991, on the debtor's "Application" to reject the collective bargaining agreement with the Union together with all testimony and exhibits introduced at hearings held on May 31, June 10, and July 8 and 25, 1991, in conjunction with various motions filed by the debtor requesting interim changes pursuant to § 1113(e).

2. Specifically, the interim changes, as set forth in an order entered on June 5, 1991, consisted of: (1) modification of health care benefits to provide the bargaining unit employees with the same plan as salaried employees; (2) suspension of payments to the Union's pension fund; (3) elimination of daily overtime relative to ten hour per day work shifts (Overtime rates would only be paid for time worked in excess of 40 hours per week); (4) payment of holiday work at straight time rather than overtime and the elimination of eight paid holidays; (5) payment of vacations entirely at straight time; (6) a temporary cap on daily wage rates; and (7) elimination of an annual paid personal day.

3. The debtor does not dispute that Claim No. 167, as amended by Claim No. 244, constitutes a claim filed by the Union.

087.09 as "damages from rejection of the Collective Bargaining Agreement." Attached to Claim No. 244 is a copy of Claim No. 167, excluding exhibits, together with an attachment containing an itemized list of 286 "hourly employee claimants." A second attachment contains a list of dollar amounts claimed collectively by all employees within specified job classifications identified in the Agreement. Finally, on July 10, 1992, the Union amended its claim a second time by filing a claim, designated as Claim No. 248, again in the name of "SLU LOCAL 188, FOR HOURLY EMPLOYEES." This claim seeks $18,993,167.00 to $20,127,443.00 as "DAMAGES FROM REJECTION OF THE COLLECTIVE BARGAINING AGREEMENT AND INTERIM RELIEF." Although the words, "SEE ATTACHMENTS" are typed on the claim, no attachments are appended to the claim. Presumably, the attachments accompanying Claim No. 244 are relied upon to support Claim No. 248.

The initial claim (No. 167) and amended claims (Nos. 244 and 248) assert a prepetition unsecured nonpriority claim for damages allegedly arising from the debtor's rejection of the Agreement. Amended Claim No. 248 also asserts a prepetition unsecured nonpriority claim for damages allegedly attributable to the interim changes to the Agreement implemented prior to its rejection on August 30, 1991.[4]

The Union grounds its claim on the aggregate of the amount each of the 286 bargaining unit employees is projected to lose as a result of the interim changes and subsequent rejection of the Agreement. The rejection damages reflect those wages and benefits each employee might expect to receive had he remained employed after August 30, 1991, the date the Agreement was rejected, to May 5, 1993, the date the Agreement was to terminate. The total

amounts claimed are identical for all employees within certain job classifications. For example, the Union contends that as a result of the debtor's rejection of the Agreement, 101 employees classified as Continuous Miner Operators, First Class Mechanics, Electricians, and Roof Bolters have claims totalling between $6,218,349.82 and $6,618,915.82. This claim, as it relates to each of the 101 employees, is alleged generally to consist of: lost future wages ($53,962.41); life insurance ($362.20); Christmas Bonus ($530.00); Personal Leave Day ($173.25); Vacation Pay ($2,051.56); Pension Fund ($600.00); and health and dental insurance ($3,888.40 for single coverage and $7,854.40 for family coverage). Thus, each of these 101 claimants asserts a claim in the aggregate alternative amounts of $61,567.82, or $65,533.82, depending upon the health insurance coverage each individual employee maintained. Assuming each employee had single coverage health insurance, the total claim for these 101 employees amounts to $6,218,349.82. Assuming each employee had family coverage health insurance, the total claim amounts to $6,618,915.82. A similar analysis is made for employees within other defined job classifications. This gives rise to the total claims asserted by the Union in amended Claim No. 244 ranging from $17,-389,811.09 to $18,524,087.09. The variance is attributed to single versus family health care insurance coverage.[5]

## II

Before the court reaches the issue of whether damages are recoverable by the Union, the debtor has raised procedural issues which must be addressed.

■ First, the debtor contends that the Union's second amended claim (Claim No. 248) asserts a new claim filed after the bar

---

**4.** At no time, prepetition or postpetition, was the debtor in default under any terms of the Agreement. Thus, the Union's only claim emanates from the interim changes implemented pursuant to § 1113(e) and from the debtor's rejection of the Agreement under § 1113(c).

**5.** The $18,993,167 to $20,127,443 claim asserted by the Union in Amended Claim No. 248 is not

supported by the exhibits appended to Claim No. 244. Presumably, the differences in amounts between amended Claim Nos. 244 and 248, relates to the Union's claim for damages attributable to the debtor's implementation of the interim changes to the Agreement. This discrepancy is not material to the issues addressed in this Memorandum.

date fixed pursuant to Fed.R.Bankr.P. 3003(c)(3) for filing claims.[6] Assuming the applicability of the bar date, the Union's original claim (Claim No. 167) was filed timely. However, the second amended claim, by which the Union, for the first time, seeks damages arising from the interim changes which the court granted from the Agreement, was filed on July 10, 1992, nine months after expiration of the claims bar date. The debtor contends that damages arising from the interim changes are the subject of an entirely different cause of action than the rejection damages, and that because this claim was asserted for the first time after expiration of the claims bar date, the claim must be denied.

■ Fed.R.Bankr.P. 7015 states that "Rule 15 F.R.Civ.P. applies in adversary proceedings."[7] Fed.R.Bankr.P. 9014 is available to extend Rule 7015 to contested matters, such as the instant dispute over the Union's claim.[8] Therefore, whether the Union may amend its claim to include damages arising from interim relief granted the debtor pursuant to § 1113(e) is controlled by Fed.R.Civ.P. 15(c). The amendment is, accordingly, valid only if it arose out of the "conduct, transaction or occurrence" which gave rise to the timely filed claim. *Matter of Unroe*, 937 F.2d 346, 349 (7th Cir.1991); *See also, In re Butcher*, 74 B.R. 211, 216 (Bankr.E.D.Tenn.1987) ("[A]mendment to a claim is freely allowed where the purpose is to cure a defect in the claim as originally filed, to describe the

claim with greater particularity, or to plead a new theory of recovery on the facts set forth in the original claim").

Damages from both the rejection and the interim changes stem from the debtor's attempts to first modify and then reject the Agreement. Even though the debtor's efforts occurred under separate motions, at different times, and accomplished different results, the thrust of those efforts was directed towards the same subject: the May 5, 1990 Agreement. Because the damages allegedly incurred by the Union all flow from the same conduct of the debtor—to gain relief from the Agreement, the standard of Rule 15(c) is satisfied. To the extent Amended Claim No. 248 seeks damages from the interim changes as well as damages from rejection of the Agreement, the claim relates back to Claim No. 167 and is deemed timely filed.

■ Second, the debtor contends that the Union lacks standing to assert a claim on behalf of its members. Relying on *Reid v. White Motor Corp.*, 886 F.2d 1462 (6th Cir.1989), *cert. denied*, 494 U.S. 1080, 110 S.Ct. 1809, 108 L.Ed.2d 939 (1990), the debtor contends that the Union's claim, as amended, should be dismissed for failure to comply with Fed.R.Civ.P. 23, as incorporated into Fed.R.Bankr.P. 7023. Characterizing the Union's claim as a class claim, the debtor argues that the claim must be denied because the class was not certified pursuant to Fed.R.Bankr.P. 7023.[9] The

---

**6.** October 15, 1991, was fixed as the bar date for filing proofs of claim in this case. The debtor, however, ignores the potential effect of the proviso in Rule 3003(c)(3) that "[n]otwithstanding the expiration of such ... [claims bar date], a proof of claim may be filed to the extent and under the conditions stated in Rule 3002 ... (c)(4)." Fed.R.Bankr.P. 3002(c)(4) provides that "[a] claim arising from the rejection 'of an executory contract or unexpired lease of the debtor may be filed within such time as the court may direct."

**7.** Fed.R.Civ.P. 15(c), as amended April 30, 1991, effective December 1, 1991, provides in material part:
> An amendment of a pleading relates back to the date of the original pleading when
> . . . .
> (2) the claim or defense asserted in the amended pleading arose out of the conduct,

transaction, or occurrence set forth or attempted to be set forth in the original pleading. . . .

**8.** Fed.R.Bankr.P. 9014 provides in material part that "[i]n a contested matter ... the following rules shall apply: 7021, 7025, 7026, 7028–7037, 7041, 7042, 7052, 7054–7056, 7062, 7064, 7069, and 7071. The court may at any stage in a particular matter direct that one or more of the other rules in Part VII shall apply." The court deems it appropriate that Rule 7015, one of the "other rules" referred to in Rule 9014, shall apply to the Union's amended claim.

**9.** The court expressed its concern over the possible class action nature of the Union's claim with counsel for the Union and debtor in open court on more than one occasion, and, thus, perhaps solicited this objection. That concern, for reasons discussed in this Memorandum, has been eliminated.

debtor further argues that the Union would not be able to represent the class because it is not a member of the class it seeks to represent.

■ Section 501(a) of the Bankruptcy Code provides that "[a] creditor or an indenture trustee may file a proof of claim." 11 U.S.C.A. § 501(a) (West 1979). Generally, labor unions constitute creditors. *In re Altair Airlines, Inc.,* 727 F.2d 88, 89–90 (3d Cir.1984) (Air Line Pilots Association is a creditor that is eligible to serve on a Creditor's Committee); *U.S. Truck v. Teamsters Nat'l Freight Industry Negotiating Committee (In re U.S. Truck),* 89 B.R. 618 (E.D.Mich.1988).

Bankruptcy Code § 101(10) provides in material part:

"creditor" means—

(A) entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor;

(B) entity that has a claim against the estate of a kind specified in section ... 502(g) ... of this title[.]

11 U.S.C.A. § 101(10) (West Supp.1992).

The Union's claim does not fall within the purview of Subsection (A).[10] Under Subsection (B) of § 101(10), however, the Union may file a claim under § 501 as a "creditor" if it (1) is an entity; (2) has a claim; and (3) the claim is of the kind specified in § 502(g).

■ The Union constitutes an "entity" pursuant to the Bankruptcy Code. An "entity" is defined as a "person, estate, trust, governmental unit [or] United States trustee." 11 U.S.C.A. § 101(15) (West Supp. 1992). A "person" is defined as an "individual, partnership [or] corporation[.]" 11 U.S.C.A. § 101(41) (West Supp.1992). Finally, a "corporation" includes an "unincorporated company or association[.]" 11 U.S.C.A. § 101(9)(A)(iv) (West Supp.1992). The Union is an unincorporated association under 29 U.S.C.A. § 185(b) (West 1978). *Altair,* 727 F.2d at 89–90.

■ The Union also asserts a "claim" against the bankruptcy estate. A "claim" is defined in material part as a:

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured[.]

11 U.S.C.A. § 101(5) (West Supp.1992).

■ Whether the Union has a "right to payment" is determined by the law governing the transaction between the claimant and the debtor. *Altair,* 727 F.2d at 90; *U.S. Truck,* 89 B.R. at 622. Under § 301 of the Labor Management Relations Act, the Union has the right to enforce its collective bargaining agreement. Section 301 provides in material part:

(a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties. . . .

(b) Any labor organization which represents employees in an industry affecting commerce as defined in this chapter and any employer whose activities affect commerce as defined in this chapter shall be bound by the acts of its agents. Any such labor organization may sue or be sued as an entity and in behalf of the employees whom it represents in the courts of the United States.

29 U.S.C.A. § 185(a) and (b) (West 1978).

■ Because the Union may sue to enforce the terms of the Agreement outside of bankruptcy, it has a "right to payment" sufficient to support a claim in bankruptcy. *U.S. Truck,* 89 B.R. at 622.

Finally, the Union asserts its claim, at least facially, under § 502(g) as a claim arising from the rejection of an executory contract under Bankruptcy Code § 365. Because the issue of whether the Union's claim is maintainable under § 502(g) is intertwined with the substantive merits of

---

10. *See supra* n. 4.

the debtor's objection, it will be discussed in Parts III and IV of this Memorandum.

The debtor's reliance on *Reid v. White Motor* is misplaced. The *Reid* case did not involve a labor union representing its members. Reid, an attorney representing former employees of a debtor corporation, filed a proof of claim in his own name as the purported agent of the class of former employees. Appended to the proof of claim was a list of unidentified names. The Sixth Circuit held that class claims were appropriate in bankruptcy. However, because Reid was obviously representing a class but blatantly ignored the procedures regulating the filing of class proofs of claim, his claim was properly denied. *Reid*, 886 F.2d at 1470–71.

As already explained, although the Union's claim is on behalf of its members, the Union itself would have a "right to payment" if successful. The Union's claim is treated as its own rather than that of its individual members. Because the Union would not be required to comply with Fed. R.Civ.P. 23 in a nonbankruptcy lawsuit for the breach of the Agreement, it need not comply with Bankruptcy Rule 7023 in order to assert a claim on behalf of its members. *See U.S. Truck*, 89 B.R. at 618. Accordingly, the Union's claim will not be dismissed for failure to comply with Bankruptcy Rule 7023.

■ Finally, the debtor contends that the Union failed to prove its agency status as required by Fed.R.Bankr.P. 2019(a).[11]

It is undisputed that the Union did not comply with the provisions of Bankruptcy Rule 2019(a). However, such compliance is not required. The Union is not treated as an agent filing multiple claims. As already explained, the claim filed by the Union is treated as its own even though it was filed on behalf of its members. Further, the issue of the amount of damages has been bifurcated from the issue of whether damages are recoverable. If damages were to be recoverable, the Union would necessarily be given the opportunity to prove the damages alleged to have been incurred by its individual members.

### III

■ The Union contends that it is entitled to damages to compensate its members for the wages and other benefits they would have earned had the Agreement not been rejected by the debtor pursuant to § 1113(c). The Union also seeks damages for the interim changes implemented pursuant to § 1113(e) which effectively modified the Agreement. The debtor contends that no damages are available to the Union's members. It contends, *inter alia*, that allowing damages equal to the wages that would have been earned would emasculate the provisions of § 1113.

Since the enactment of § 1113 in 1984, no cases have been reported that resolve the issue before the court. Indeed, the cases relied upon by the Union in its "Prehearing Memorandum" filed June 30, 1992, in support of its claim for damages, all involve

---

11. Fed.R.Bankr.P. 2019(a) provides:

In a chapter 9 municipality or chapter 11 reorganization case, except with respect to a committee appointed pursuant to § 1102 or 1114 of the Code, every entity or committee representing more than one creditor or equity security holder and, unless otherwise directed by the court, every indenture trustee, shall file a verified statement setting forth (1) the name and address of the creditor or equity security holder; (2) the nature and amount of the claim or interest and the time of acquisition thereof unless it is alleged to have been acquired more than one year prior to the filing of the petition; (3) a recital of the pertinent facts and circumstances in connection with the employment of the entity or indenture trustee, and, in the case of a committee, the name or names of the entity or entities at whose instance, directly or indi-

rectly, the employment was arranged or the committee was organized or agreed to act; and (4) with reference to the time of the employment of the entity, the organization or formation of the committee, or appearance in the case of any indenture trustee, the amounts of claims or interests owned by the entity, the members of the committee or the indenture trustee, the times when acquired, the amounts paid therefor, and any sales or other disposition thereof. The statement shall include a copy of the instrument, if any, whereby the entity, committee, or indenture trustee is empowered to act on behalf of creditors or equity security holders. A supplemental statement shall be filed promptly, setting forth any material changes in the facts contained in the statement filed pursuant to this subdivision.

collective bargaining agreements rejected pursuant to the provisions of Code § 365. *See NLRB v. Bildisco and Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984); *Air Line Pilots Ass'n, Int'l v. Continental Airlines, Inc.,* 901 F.2d 1259 (5th Cir.1990), *cert. denied,* —— U.S. ——, 113 S.Ct. 87, 121 L.Ed.2d 50 (1992); *U.S. Truck Co., Inc. v. Teamsters Nat'l Freight Industry Negotiating Committee (In re U.S. Truck),* 89 B.R. 618 (E.D.Mich.1988).

Since enactment of the Bankruptcy Code, § 365(a) and (g) have provided the statutory framework governing rejection and the effect of rejection of most executory contracts and unexpired leases.[12] Section 365(a) provides:

> Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

11 U.S.C.A. § 365(a) (West Supp.1992).

When an executory contract or unexpired lease is rejected pursuant to § 365(a), § 365(g) comes into play. This section provides in material part:

> [T]he rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease—
>
> (1) if such contract or lease has not been assumed under this section or under a plan confirmed under chapter 9, 11, 12, or 13 of this title, immediately before the date of the filing of the petition[.]

11 U.S.C.A. § 365(g) (West Supp.1992).

While § 365 is the section of the Code dealing with rejection of an executory contract or unexpired lease, § 502(g) dictates the status of the claim which arises as a result of the rejection. Section 502(g) provides:

> A claim arising from the rejection, *under section 365 of this title or under a plan under chapter 9, 11, 12, or 13 of this title,* of an executory contract or unexpired lease of the debtor that has not been assumed shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition.

11 U.S.C.A. § 502(g) (West Supp.1992) (emphasis added).

In sum, most executory contracts may be rejected unilaterally by the debtor pursuant to § 365(a). Once rejected, pursuant to § 365(g), the executory contract is treated as having been breached as of the date immediately preceding the date of the filing of the petition. Section 502(g) gives the entity injured by the rejection of an executory contract, either under § 365 or under a plan of reorganization, a prepetition claim for any resulting damages, and requires that the injured entity be treated as a prepetition creditor with respect to that claim. 2 *Collier On Bankruptcy* ¶ 365.08 (15th ed. 1992).

Before enactment of § 1113, collective bargaining agreements were considered executory contracts which could be assumed or rejected within the framework of § 365. *Bildisco,* 465 U.S. at 521–24, 104 S.Ct. at 1194. This was true even though the National Labor Relations Act contained specific provisions for the termination or modification of a collective bargaining agreement.[13] *Id.* at 519–20, 104 S.Ct. at 1193.

---

**12.** Excluded from the operation of § 365 are certain provisions governing transactions related to commodity broker liquidations in Subchapter IV of Chapter 7.

**13.** Section 8(d) of the National Labor Relations Act provides in material part:

> For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to

wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession: *Provided,* That where there is in effect a collective-bargaining contract covering employees in an industry affecting commerce,

Because of the special nature of collective bargaining agreements, courts generally held that a higher standard had to be met for their rejection than for other types of contracts. However, courts disagreed on exactly what standard should be applied. *Compare Brotherhood of Railway, Airline and Steamship Clerks v. REA Express, Inc.*, 523 F.2d 164 (2d Cir.1975), *cert. denied* 423 U.S. 1017, 96 S.Ct. 451, 46 L.Ed.2d 388 (1975) (rejection of a collective bargaining agreement should only be allowed if the debtor's reorganization would otherwise fail) with *Brada Miller Freight System, Inc.*, 702 F.2d 890 (11th Cir.1983) (rejection of a collective bargaining agreement may be permitted after a careful balancing of the equities on both sides); *see also 5 Collier On Bankruptcy* ¶ 1113.01[3] (15th ed. 1992).

The issue was finally resolved by the Supreme Court in *Bildisco*. There, the Court held that a collective bargaining agreement was, indeed, an executory contract subject to the unilateral rejection by a debtor in possession pursuant to § 365(a). The Supreme Court stated:

We agree with the Court of Appeals below, and with the Court of Appeals for the Eleventh Circuit in a related case, *In re Brada Miller Freight System, Inc., supra,* that the Bankruptcy Court should permit rejection of a collective-bargaining agreement under § 365(a) of the Bankruptcy Code if the debtor can show that the collective-bargaining agreement burdens the estate, and that after careful scrutiny, the equities balance in favor of rejecting the labor contract. The standard which we think Congress intended is a higher one than that of the "business judgment" rule, but a lesser one than that embodied in the *REA Express* opinion of the Court of Appeals for the Second Circuit.

Before acting on a petition to modify or reject a collective-bargaining agreement, however, the Bankruptcy Court should be persuaded that reasonable efforts to negotiate a voluntary modification have been made and are not likely to produce a prompt and satisfactory solution. The NLRA requires no less.

465 U.S. at 525–26, 104 S.Ct. at 1196.

In addition to accepting the lower standard for rejection, the Supreme Court also held that, between the petition date and the time rejection is judicially authorized, the debtor need not comply with the labor contract and may unilaterally alter its terms. 465 U.S. at 532, 104 S.Ct. at 1199.

Section 1113, enacted as part of the Bankruptcy Amendments and Federal Judgeship Act of 1984, was the Congressional response to the Supreme Court's decision in *Bildisco*.[14] *Sheet Metal Workers' Int'l Ass'n Local 9 v. Mile Hi Metal Sys-*

---

the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification—

(1) serves a written notice upon the other party to the contract of the proposed termination or modification sixty days prior to the expiration date thereof, or in the event such contract contains no expiration date, sixty days prior to the time it is proposed to make such termination or modification;

(2) offers to meet and confer with the other party for the purpose of negotiating a new contract or a contract containing the proposed modifications;

(3) notifies the Federal Mediation and Conciliation Service within thirty days after such notice of the existence of a dispute....; and

(4) continues in full force and effect, without resorting to strike or lockout, all the terms and conditions of the existing contract for a period of sixty days after such notice is given or until the expiration date of such contract, whichever occurs later.

The duties imposed upon employers, employees, and labor organizations by paragraphs (2)–(4) ... shall not be construed as requiring either party to discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period, if such modification is to become effective, before such terms and conditions can be reopened under the provisions of the contract....

29 U.S.C.A. § 158(d) (West 1973 & Supp.1992).

**14.** Section 1113 (West Supp.1992) provides:

(a) The debtor in possession, or the trustee if one has been appointed under the provisions of this chapter, other than a trustee in a case covered by subchapter IV of this chapter and by title I of the Railway Labor Act, may assume or reject a collective bargaining agreement only in accordance with the provisions of this section.

(b)(1) Subsequent to filing a petition and prior to filing an application seeking rejection

*tems, Inc. (In re Mile Hi Metal Systems, Inc.),* 899 F.2d 887, 889–90 (10th Cir.1990). With the enactment of § 1113, Congress expressly eliminated collective bargaining agreements from the framework of § 365. By doing this, it also removed collective bargaining agreements from the provisions of § 502(g), which by its terms has application to a claim arising from the rejection of an executory contract or unexpired lease "under section 365." Congress did not, however, at the same time provide any alternative to § 365(g) governing the effect of the debtor's rejection of a collective bar-

gaining agreement nor did it provide, as does § 502(g), that, to the extent the entity injured by the rejection has an allowable claim, that claim is treated as a prepetition claim for the damages flowing from the rejection. Thus, the Union's reliance on case law construing §§ 365 and 502(g) in support of its entitlement to a claim for damages is misplaced. These sections simply have no application where § 1113 is involved.

The lack of any statutory provision governing the effect of a debtor's rejection of

of a collective bargaining agreement, the debtor in possession or trustee (hereinafter in this section, "trustee" shall include a debtor in possession), shall—

(A) make a proposal to the authorized representative of the employees covered by such agreement, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and

(B) provide, subject to subsection (d)(3), the representative of the employees with such relevant information as is necessary to evaluate the proposal.

(2) During the period beginning on the date of the making of a proposal provided for in paragraph (1) and ending on the date of the hearing provided for in subsection (d)(1), the trustee shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such agreement.

(c) The court shall approve an application for rejection of a collective bargaining agreement only if the court finds that—

(1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1);

(2) the authorized representative of the employees has refused to accept such proposal without good cause; and

(3) the balance of the equities clearly favors rejection of such agreement.

(d)(1) Upon the filing of an application for rejection the court shall schedule a hearing to be held not later than fourteen days after the date of the filing of such application. All interested parties may appear and be heard at such hearing. Adequate notice shall be provided to such parties at least ten days before the date of such hearing. The court may extend the time for the commencement of such hearing for a period not exceeding seven days where the circumstances of the case, and

the interests of justice require such extension, or for additional periods of time to which the trustee and representative agree.

(2) The court shall rule on such application for rejection within thirty days after the date of the commencement of the hearing. In the interests of justice, the court may extend such time for ruling for such additional period as the trustee and the employees' representative may agree to. If the court does not rule on such application within thirty days after the date of the commencement of the hearing, or within such additional time as the trustee and the employees' representative may agree to, the trustee may terminate or alter any provisions of the collective bargaining agreement pending the ruling of the court on such application.

(3) The court may enter such protective orders, consistent with the need of the authorized representative of the employees to evaluate the trustee's proposal and the application for rejection, as may be necessary to prevent disclosure of information provided to such representative where such disclosure could compromise the position of the debtor with respect to its competitors in the industry in which it is engaged.

(e) If during the period when the collective bargaining agreement continues in effect, and if essential to the continuation of the debtor's business, or in order to avoid irreparable damage to the estate, the court, after notice and a hearing, may authorize the trustee to implement interim changes in the terms, conditions, wages, benefits, or work rules provided by a collective bargaining agreement. Any hearing under this paragraph shall be scheduled in accordance with the needs of the trustee. The implementation of such interim changes shall not render the application for rejection moot.

(f) No provision of this title shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this section.

11 U.S.C.A. § 1113 (West Supp.1992).

a collective bargaining agreement and the status of any resulting claim for damages presents a dilemma. On one hand, it is difficult to believe that Congress provided for rejection of a collective bargaining agreement under § 1113, but neither defined the status of any claim which might result from that rejection nor provided a remedy for the breach cognizable under the Bankruptcy Code. On the other hand, the court is compelled to apply the Bankruptcy Code as written.

 Resort to legislative history is appropriate only when faced with statutory language that is unclear. *Toibb v. Radloff,* —— U.S. ——, ——, 111 S.Ct. 2197, 2200, 115 L.Ed.2d 145 (1991). The Supreme Court has admonished trial and appellate courts that:

> canons of construction are no more than rules of thumb that help courts determine the meaning of legislation, and in interpreting a statute a court should always turn first to one, cardinal canon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: "judicial inquiry is complete."

*Conn. Nat'l. Bank v. Germain,* —— U.S. ——, ——, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992) (citations omitted; quoting *Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981)).

 There is no statutory ambiguity involved in this issue. Section 1113(a) unequivocally states that a debtor in possession or trustee "may assume or reject a collective bargaining agreement *only* in accordance with the provisions of ... [§ 1113]." 11 U.S.C.A. § 1113(a) (West Supp.1992) (emphasis added). There is merely the absence of any provision comparable to § 365(g) governing the effect of rejection of a collective bargaining agreement under § 1113. Therefore, reliance on § 1113's legislative history would be inappropriate. Even were the court to rely on the legislative history, it is doubtful that it would provide any insight. No committee reports were issued regarding the enactment of § 1113. The entire legislative history is composed of floor statements made by opposing partisans. *Mile Hi Metal Systems,* 899 F.2d at 890; *New York Typographical Union v. Royal Composing Room, Inc. (In re Royal Composing Room, Inc.),* 848 F.2d 345 (2d Cir.1988) (Feinburg, C.J., dissenting), *cert. denied,* 489 U.S. 1078, 109 S.Ct. 1529, 103 L.Ed.2d 834 (1989); *In re Carey Transportation, Inc.,* 50 B.R. 203 (Bankr.S.D.N.Y.1985), *aff'd sub. nom. Truck Drivers Local 807 v. Carey Trans., Inc.,* 816 F.2d 82 (2d Cir. 1987).

While the issue of claims for damages for rejection under § 1113 has, apparently, not been litigated, some courts have assumed, in dicta, that such claims will be determined pursuant to §§ 365 and 502(g). *See, e.g., In re Garofalo's Finer Foods, Inc.,* 117 B.R. 363, 371 (Bankr.N.D.Ill.1990) (one factor to consider in decision on rejection of a collective bargaining agreement is the amount of employee damage claims under § 502(g) for such rejection and their impact on the debtor's ability to obtain confirmation of a plan). At least one bankruptcy court has recognized the absence of any provision in § 1113 governing the effect of rejection. The bankruptcy court in *In re Moline Corp.,* 144 B.R. 75 (Bankr. N.D.Ill.1992), viewed the absence of any provision in § 1113 comparable to § 365(g) as a "legislative gaffe." *Id.* at 78–79. It speculated that "when Congress added § 1113 in 1984, it forgot to make conforming amendments to other provisions in the Bankruptcy Code, including § 365." *Id.* The court stated that "it would appear that § 365 must apply to fill in the gap left by § 1113." *Id.* The court acknowledged, however, that "§ 365(g) only provides for the treatment of executory contracts or leases assumed or rejected 'under this section,' *i.e.,* § 365." *Id.*

 By enacting § 1113, Congress did not eliminate the ability of a Chapter 11 debtor to reject a collective bargaining agreement. However, Congress reversed

*Bildisco*'s holding allowing unilateral modifications post-petition. It also erected "both procedural and substantive barriers to a debtor's rejection or modification of a collective bargaining agreement." *In re Roth American, Inc.*, 975 F.2d 949, 956 n. 8 (3d Cir.1992).

> Before filing an application seeking rejection of a collective bargaining agreement, the debtor-in-possession must make a proposal to the representative of the employees "which provides for those necessary modifications ... that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably," and must "confer in good faith in attempting to reach mutually satisfactory modifications of such agreement." Only after these requirements have been met may a court approve an application for rejection, and then still only if the union "has refused to accept [the] proposal without good cause" and "the balance of the equities clearly favors rejection of [the] agreement."

*Id.* (citations omitted).

Given the barriers to rejection included in § 1113, it is arguable that Congress intended that no claim for damages for rejection of a collective bargaining agreement would be allowed. Pursuant to § 1113(b) and (c), a debtor may now reject a collective bargaining agreement only if it is necessary for reorganization. If rejection is truly necessary, then allowing a claim for damages, especially if the amount of that claim represents lost future wages and benefits, would necessarily assure the failure of the reorganization.

Regardless of the speculation on Congress' intentions for omitting a provision governing the effect of rejection of a collective bargaining agreement under § 1113, this court cannot ignore the plain language of the Bankruptcy Code. "The fact that Congress may not have foreseen all of the consequences of a statutory enactment is not a sufficient reason for refusing to give effect to its plain meaning." *Union Bank v. Wolas*, —— U.S. ——, ——, 112 S.Ct. 527,

531, 116 L.Ed.2d 514 (1991). Likewise, this court will not read something into a statutory scheme that Congress may or may not have mistakenly left out. That would be tantamount to rewriting provisions of the Bankruptcy Code, a task properly left to Congress.

The only conclusion this court can reach is that a claim for damages alleged to have resulted from the rejection of a collective bargaining agreement under § 1113 cannot be premised on § 365(g) nor can the claim be asserted pursuant to § 502(g).

In sum, prior to the enactment of § 1113, § 502(g) recognized a remedy for a debtor's breach of a collective bargaining agreement. *See In re Continental Airlines Corp.*, 57 B.R. 845, 853 (Bankr.S.D.Tex. 1985). That remedy provided the entity injured by rejection under § 365 with a prepetition claim for any resulting damages. The Bankruptcy Amendments and Federal Judgeship Act of 1984, which enacted § 1113, did not make § 502(g) applicable to the rejection of a collective bargaining agreement under § 1113. Accordingly, the Bankruptcy Code, as presently enacted, does not provide or recognize a remedy for damages resulting from rejection of a collective bargaining agreement under § 1113.

## IV

In the absence of provisions comparable to §§ 365(g) and 502(g), which enable an entity injured by rejection of an executory contract or unexpired lease under § 365 to assert a prepetition claim for the resulting breach, an entity asserting a claim for damages as a result of the rejection of a collective bargaining agreement under § 1113 is not a "creditor," as defined under Code § 101(10)(B). The injured entity cannot satisfy the § 101(10)(B) requirement that its claim against the estate is "of a kind specified in section ... 502(g)." 11 U.S.C.A. § 101(10)(B) (West Supp.1992). Accordingly, an entity injured by the rejection of a collective bargaining agreement is

not entitled to file a claim under § 501.[15] Further, that entity does not have a claim allowable under Code § 502. This is true because § 502(a) mandates as a prerequisite to allowance that the claim be filed "under § 501." 11 U.S.C.A. § 502(a) (West Supp.1992). Additionally, § 502(b) provides that if an objection is made to a claim "the court ... shall determine the amount of such claim ... *as of the date of the filing of the petition.*" 11 U.S.C.A. § 502(b) (West Supp.1992) (emphasis added).[16]

The effect of § 502(b) is summarized as follows:

Section 502(b) states as a general proposition that if objection to a claim is made, it is the court, after notice and a hearing, which is to determine the amount of the claim fixed *as of the date of the filing of the petition.* In determining the amount of the claim *as of the date of the filing of the petition,* the court shall allow the claim in such amount in lawful currency of the United States as is proper *at the time of the filing of the petition* except to the extent that all or part of the claim is not the kind of claim which may share in a distribution of the assets of the debtor, *i.e.,* is not an allowable claim.

The eight paragraphs of section 502(b) of the Code state the standards of allowability. To the extent that all or part of any claim falls within any of these subdivisions, such claim may not be permitted to share in a distribution of the debtor's assets. In short a claim falling within the reach of the paragraphs of section 502(b) is simply not allowable.... For

---

**15.** As noted previously, § 501(a) provides that "[a] creditor ... may file a proof of claim." 11 U.S.C.A. § 501(a) (West 1979). Section § 501(d) provides that "[a] claim of a kind specified in section ... 502(g) ... may be filed ... the same as if such claim were a claim against the debtor and had arisen before the date of the filing of the petition." 11 U.S.C.A. § 501(d) (West Supp. 1992). Section 501(d) makes clear that a proof of claim may be filed under subsection (a) of § 501 for claims allowable under § 502(g).

**16.** Subsections (a) and (b) of § 502, in their entirety, provide:

**Allowance of claims or interests.**

(a) A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, including a creditor of a general partner in a partnership that is a debtor in a case under chapter 7 of this title, objects.

(b) Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States *as of the date of the filing of* the petition, and shall allow such claim in such amount, except to the extent that—

(1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because *such claim is contingent or* unmatured;

(2) such claim is for unmatured interest;

(3) if such claim is for a tax assessed against property of the estate, such claim exceeds the value of the interest of the estate in such property;

(4) if such claim is for services of an insider or attorney of the debtor, such claim exceeds the reasonable value of such services;

(5) such claim is for a debt that is unmatured on the date of the filing of the petition and that is excepted from discharge under section 523(a)(5) of this title;

(6) if such claim is the claim of a lessor for damages resulting from the termination of a lease of real property, such claim exceeds—

(A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of—

(i) the date of the filing of the petition; and

(ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property; plus

(B) any unpaid rent due under such lease without acceleration, on the earlier of such dates;

(7) if such claim is the claim of an employee for damages resulting from the termination of an employment contract, such claim exceeds—

(A) the compensation provided by such contract, without acceleration, for one year following the earlier of—

(i) the date of the filing of the petition; or

(ii) the date on which the employer directed the employee to terminate, or such employee terminated, performance under such contract; plus

(B) any unpaid compensation due under such contract, without acceleration, on the earlier of such dates; or

(8) such claim results from a reduction, due to late payment, in the amount of an otherwise applicable credit available to the debtor in connection with an employment tax on wages, salaries, or commissions earned from the debtor.

11 U.S.C.A. § 502(a) and (b) (West Supp.1992).

purposes of section 502(b) ... except as subsections (e)(2), (f), (g), (h), and (i) of section 502 provide otherwise, the general proposition is that if an objection to a claim is taken, it is the court, after notice and a hearing, which is to determine the amount of the claim *as of the date of the filing of the petition.* The claim is allowed in the amount the court has determined, except to the extent that all or part of that claim is within the reach of any of the subsections of section 502(b). 3 *Collier On Bankruptcy* ¶ 502.02 (15th ed. 1992) (emphasis added; footnote omitted).

Section 365(g)(1) provides that where the executory contract or unexpired lease has been rejected under § 365, the rejection constitutes a breach "immediately before the date of the filing of the petition." The effect of the breach, as stated under § 502(g), will then be to permit the party injured by the rejection to seek allowance of its resulting claim as a prepetition claim under § 502(b). In the face of an objection, the amount of the claim can then be determined "as of the date of the filing of the petition." However, when §§ 365(g) and 502(g) are removed from the equation, the rejection provides the entity injured thereby with a breach of the executory contract, but with no vehicle by which to assert the damages resulting from that breach as having arisen "before the date of the filing of the petition." Therefore, the entity sustaining the breach is not only incapable of meeting the § 502(a) requirement that the claim be "filed under section 501," it also does not hold a claim cognizable under § 502(b) because the claim is not capable of being determined "as of the date of the filing of the petition."

### V

 In accordance with the above, inasmuch as the Union is not a "creditor" nor does it hold a claim otherwise allowable under § 502, it is not entitled to assert a claim for damages alleged to have resulted from the rejection of the Agreement on August 30, 1991, nor is it entitled to assert a claim for damages alleged to have oc-

curred as a result of the interim changes implemented to the Agreement pursuant to § 1113(e).

This Memorandum constitutes findings of fact and conclusions of law as required by Fed.R.Bankr.P. 7052. An appropriate order sustaining the debtor's Objection To Claim and disallowing the Union's Claim No. 167, as amended by Claims No. 244 and 248, will be entered. To the extent the debtor's "Motion To Dismiss Amended Claim No. 167 Filed By Southern Labor Union Local 188 For Hourly Employees" seeks to disallow the Union's claim on procedural grounds, the motion will be denied.